UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

SECURITIES AND EXCHANGE
COMMISSION,

        Plaintiff,

    v.

PAUL ALAR and WEST
MOUNTAIN, LLC,

        Defendants.

CIVIL ACTION NO.
1:19-CV-03265-JPB

## ORDER

This matter comes before the Court on the Securities and Exchange

Commission's (the "SEC") Motion for Summary Judgment [Doc. 51] and Paul

Alar and West Mountain, LLC's (collectively, "Defendants") Motion for Summary

Judgment [Doc. 52].  This Court finds as follows:

## PROCEDURAL HISTORY

This case concerns allegations that an investment advisory firm violated the

Investment Advisers Act of 1940 (the "Advisers Act") by (1) fraudulently

overvaluing certain assets—namely, investments in subsidiaries of two privately-

held companies—and collecting inflated fees as a result (the "overvaluation

claim"); and (2) misrepresenting to investors that negotiations between one of the

privately-held companies and a nationally-known petroleum company were

ongoing and represented a significant gain for the investment, when in fact, such negotiations did not exist (the "misrepresentation claim").

The SEC filed this action on July 18, 2019, and brought three fraud claims against Defendants under the Advisers Act, 18 U.S.C. § 80b-6, alleging that Defendants violated Sections 206(1), 206(2) and 206(4) of the Act.[1]  [Doc. 1]. Defendants filed a Motion to Dismiss on September 20, 2019.  [Doc. 11].  The Court denied the Motion to Dismiss on September 21, 2020.  [Doc. 24].  The SEC filed a Motion for Summary Judgment on August 23, 2021, and Defendants filed a Motion for Summary Judgment the same day.  [Doc. 51]; [Doc. 52].  The SEC moves for summary judgment on the overvaluation claim only; Defendants move for summary judgment as to both the overvaluation claim and the misrepresentation claim.

## FACTUAL HISTORY

The Court derives the facts of this case from the SEC's Statement of Undisputed Material Facts, [Doc. 51-2]; Defendants' Response to the SEC's Statement of Undisputed Material Facts, [Doc. 60, p. 1]; Defendants' Statement of Additional Undisputed Material Facts, [Doc. 60, p. 51]; the SEC's Statement of

---

[1] In conjunction with the Rule 206(4) claim, the SEC also alleged that Defendants violated Rule 206(4)-8, 17 C.F.R. § 275.206(4)-8.

Additional Material Facts, [Doc. 61-1]; the SEC's Response to Defendants' Statement of Material Facts, [Doc. 62]; and Defendants' Response to the SEC's Statement of Additional Material Facts, [Doc. 65].  The Court also conducted its own review of the record.

The Local Rules of this Court require a respondent to a summary judgment motion to include with its responsive brief "[a] response to the movant's statement of undisputed facts."  LR 56.1(B)(2)(a), NDGa.  The Local Rules make clear that the Court will deem each of the movant's facts admitted unless the respondent refutes or objects to the fact or shows that the fact is either immaterial or unsupported by the record.  Further, in accordance with the Local Rules, this Court will not consider unsupported facts.  The Court will, however, use its discretion to consider all facts the Court deems material after reviewing the record.  For the purpose of adjudicating the instant Motions, the facts of this case are as follows, divided into six sections for readability.

### 1.    *Background*

Defendant West Mountain, LLC ("West Mountain") is an investment advisory firm that has been in operation since 2001.  [Doc. 62, p. 1].  Defendant Paul Alar is the sole owner of West Mountain and its only employee.  [Doc. 60, p. 2].  West Mountain manages four funds into which institutional and individual

investors may invest.  [Doc. 62, p. 2].  Two of those funds are at issue in this case:

West Mountain Partners, LP ("WMP") and West Mountain, Ltd. ("WM Ltd.");

together, the "West Mountain Funds."  Id. at 3.  Alar makes all investment

decisions for the West Mountain Funds, and both he and West Mountain are

fiduciaries of the Funds.[2]  [Doc. 60, p. 3].

      As compensation for its advisory services, West Mountain earns a

management fee that is calculated as a percentage of the capital account balances

of the West Mountain Funds' investors.  Id.  West Mountain also collects

performance fees from the West Mountain Funds.  Id.  As the values of the West

Mountain Funds increase, so do the fees.[3]  Id.  Because Alar is West Mountain's

sole owner, Alar's income increases when West Mountain's management fees

increase.  Id. at 4.

---

[2] Under the governing document for WMP, the "General Partner" is responsible for determining the value of WMP's assets.  [Doc. 60, p. 6].  In turn, West Mountain is the "General Partner" responsible for that value determination.  Id. at 7.

[3] The management fee is calculated quarterly based on the assets under management and amounts to between one and two percent annually, depending on the class of investor. [Doc. 62, p. 3].  The performance fee is generally calculated as ten percent of the net capital appreciation of assets under management at the end of a calendar year.  Id.

2.    *Jones Lang LaSalle Reports on Skyworks Aeronautics Corporation and Alternative Petroleum Technologies*

The assets at issue in this case are the West Mountain Funds' interests in two development-stage, privately-held companies, Skyworks Aeronautics Corporation[4] ("SAC") and Alternative Petroleum Technologies S.A. ("APT").  Id. at 7.  SAC develops aircraft and gyroplanes; APT is an energy technology company that develops alternative fuel treatment technologies.  [Doc. 62, pp. 5–6].

Because of the West Mountain Funds' existing investments, Alar was familiar with both APT and SAC in October 2016.  [Doc. 60, p. 9].  The West Mountain Funds owned shares in the Westford Special Situations Funds II (the "Westford Funds"), which in turn owned substantial stakes in APT and SAC.  Id. Steve Stevanovich managed both the Westford Funds and SGS Asset Management LP ("SGS").  Id. at 9, 35.  At one point, the Westford Funds needed to value their equity interests in APT and SAC.  [Doc. 62, p. 6].  In 2013, then, Stevanovich arranged through SGS for Jones Lang LaSalle Corporate Appraisal and Advisory Limited ("JLL") to perform valuation services on APT and SAC.  Id.  JLL created

---

[4] Skyworks Aeronautics Corporation was previously named "Groen Brothers Aviation Global, Inc.," and is referred to as such in some of the filings in this case.  [Doc. 62, p. 5].

Scenario Analysis Reports on both APT and SAC (the "JLL Reports").[5]  [Doc. 60, pp. 33, 35].  Stevanovich testified that he understood these reports to be independent, third-party valuations.  [Doc. 52-12, p. 3].  In March 2014, Alar learned about the existence of the JLL Reports, although he did not see the actual reports until the first quarter of 2017.  [Doc. 60, pp. 52, 36].

Each JLL Report described its purpose as "to estimate the fair value of [APT and SAC] in a scenario analysis."  [Doc. 52-10, p. 9]; [Doc. 52-11, p. 9].  The introduction to each Report clarified that the exercise was "based on certain scenarios of the business plan and assumptions provided by [the respective company] and SGS."  [Doc. 52-10, p. 9]; [Doc. 52-11, p. 9].  Further, the JLL Reports defined "fair value" as "the price that would be received to sell an asset, or paid to transfer a liability, in an orderly transaction between market participants at the measurement date."  [Doc. 65, p. 1]; see also [Doc. 52-10, p. 4]; [Doc. 52-11, p. 4].  However, the "Limiting Conditions" section at the end of each Report included the following language:  "In order to avoid possible confusion, we wish to highlight that the findings of this report cannot and should not be regarded as an independent valuation.  We emphasize that this exercise is not intended to form[]

---

[5] The JLL APT Report is dated January 17, 2014, with a measurement date of October 31, 2013.  [Doc. 60, p. 33].  The JLL SAC Report is dated February 5, 2014, with a measurement date of December 31, 2013.  Id. at 35.

and does not constitute a formal opinion of value."  [Doc. 60, p. 40]; see also [Doc. 52-10, p. 34]; [Doc. 52-11, p. 31].

### 3.   *Purchase and Valuation of APT and SAC Investments*

In 2016, both APT and SAC needed capital.  [Doc. 60, p. 10].  Defendants thus negotiated direct investments into subsidiaries of APT and SAC.[6]  [Doc. 62, p. 29].  When Defendants negotiated the investments, they obtained the option to convert the shares in the subsidiaries into shares of the APT and SAC parent companies.[7]  Id. at 30.  Defendants did not engage a valuation company to estimate the fair value of the subsidiaries before directing the West Mountain Funds to invest in those entities, and as noted, Alar did not see the JLL Reports until early 2017.  [Doc. 60, pp. 12, 36].

In the first quarter of 2016, WMP invested $1 million in an APT subsidiary, which was followed by a second round of investments in the fourth quarter of 2016 of $700,000 by WMP and $300,000 by WM Ltd.  [Doc. 62, p. 29].  Also in the fourth quarter of 2016, WMP invested $5,300,000 in a SAC subsidiary.[8]  Id.  In

---

[6] At the time Defendants directed the West Mountain Funds to invest in the SAC subsidiary, the SAC subsidiary had no customers, no manufacturing facilities and no revenues.  [Doc. 60, p. 11].

[7] The agreed-upon exchange rate gave the West Mountain Funds a multiple in the parent companies' shares:  a five-times multiple for APT and a three-times multiple for SAC.  [Doc. 62, p. 30].

[8] WM Ltd. did not invest any funds in the SAC subsidiary.  [Doc. 62, p. 29].

total, the West Mountain Funds made direct equity investments of $7.3 million in the APT and SAC subsidiaries.  Id. at 30.

Defendants exercised the option to convert the subsidiary shares into shares of the parent companies in the fourth quarter of 2016.  Id.  Defendants knew that any increase in the value of the West Mountain Funds that resulted from the conversion transactions would be a cashless gain, and in fact, the conversion transactions produced no cash.  [Doc. 60, p. 16].  The unrealized gains from the conversion transactions did, though, increase the reported value of the West Mountain Funds.  Id. at 17.  Following the share exchange, the West Mountain Funds recorded a gain on their investments of $18.6 million.  [Doc. 62, p. 31].  As a result of recording these unrealized gains, Defendants claimed to have earned $1.1 million in performance fees, and they collected approximately $570,000 of those fees in January 2017.  [Doc. 60, p. 46].  The West Mountain Funds' unrealized gains also increased the quarterly management fees claimed by West Mountain and therefore increased Alar's income.[9]  Id. at 18.

---

[9] In November 2016, the last month before the conversion transactions, the West Mountain Funds paid $38,583.46 in management fees—$32,087.38 from WMP and $6,496.08 from WM Ltd.—to West Mountain.  [Doc. 60, p. 18].  In January 2017, the month after the conversion transactions, the West Mountain Funds paid $56,281.69—$47,517.71 from WMP and $8,763.98 from WM Ltd.—in management fees to West Mountain.  Id.

As a result of the share conversions, Alar obtained a seat on the boards of directors for APT and SAC.  [Doc. 62, p. 31].  By becoming a board member, Alar received the JLL Reports for the first time.  Id.  When Alar read the JLL Reports in early 2017, he was aware that some of the assumptions upon which JLL relied had not come to fruition.  [Doc. 60, p. 39].

Defendants continued to collect fees based on the increased values of the APT and SAC investments and did so until the funds ran out of cash with which to pay them.  Id. at 46.  WM Ltd. ran out of cash to pay fees in June 2018, and WMP in September 2018.  Id.  Since that time, West Mountain has continued to accrue fees on the basis of the marked-up values of the investments.  Id. at 47.

### 4. *Communications to West Mountain Funds Investors*

In an October 19, 2016 communication ("October 2016 Solicitation") to all investors in the West Mountain Funds, Alar described the anticipated purchase of the interests in the APT and SAC subsidiaries and the conversion of those interests into shares of the parent companies.  Id. at 11.  In the October 2016 Solicitation, Alar explained that he expected the conversion to generate a gain for the West Mountain Funds.  Id. at 15.  The October 2016 Solicitation asserted several reasons why the values purportedly assigned to APT and SAC by the JLL Reports were

actually too low.[10]  Id. at 42.  When Alar prepared the October 2016 Solicitation, he had not seen the JLL Reports.  Id. at 39.  However, Alar testified that he was aware of the Reports' existence and that Stevanovich and another colleague told him about the Reports' contents prior to Alar's viewing the Reports himself.  [Doc. 60, p. 52]; [Doc. 59-7, p. 8]; [Doc. 59-4, p. 13].

As to SAC, the October 2016 Solicitation discussed three primary reasons that the JLL Report's figures could change:  reallocated ownership of SAC, a contracted timeline for cash flows and the use of a different discount rate.  One of the assumptions in the JLL SAC Report was that SAC would form a joint venture with a China-based company to manufacture military aircraft.  [Doc. 52-10, p. 15]. The Wuhai government would allocate coal to the joint venture, which would in turn fund the manufacturing efforts through coal production.  Id.  However, the October 2016 Solicitation stated that "outside ownership of [SAC] was estimated at 50%, which has been changed to zero percent as a [joint venture] with a foreign entity has been pushed aside in favor of a partnership with a very well-known domestic defense contractor."  [Doc. 60, p. 42].  But notably, the JLL SAC Report

---

[10] The October 2016 Solicitation included the following language:  "[I]n its initial assessment, JLL used a number of assumptions that management expects to change as both [SAC] and APT begin to commercialize their technology. . . . Taken together, these changes portend a significant increase in value at the SGS level when the next revaluation occurs, likely by the end of Q17."  [Doc. 51-3, pp. 185–86].

listed "the Wuhai coal never comes" as a significant risk factor that could impact the company's ability to meet projections. Id. at 43. The October 2016 Solicitation also stated that "because of the new expected partnership at [SAC], the time horizon for cash flows has contracted from [fifteen] years to ten." Id. However, the JLL SAC Report analyzed twenty years of projected cash flows, not fifteen. Id. at 44. Finally, the October 2016 Solicitation stated that "a discount rate of 26% was used to discount [SAC's] expected cash flows back to present value" and that "management expects a discount rate in the mid-to-high teens, which would significantly increase the value of the cash flows." Id. The JLL SAC Report did not use a discount rate of 26% to discount any cash flows; rather, the majority of cash flows assumed from the sale of SAC's products (as opposed to those from Wuhai coal contributed by the joint venture partner) were analyzed using a discount rate of 20.57%. Id.

As to APT, the October 2016 Solicitation stated that the JLL Report assessed APT "at asset value (primarily patents) because the company's technology remained unproven." Id. The JLL APT Report did not assess the value of APT's assets or patents, though. Id. at 45. Further, as of 2017, APT had not introduced its technology in any country. [Doc. 65, p. 26].

In an email dated March 22, 2017, from West Mountain to a potential investor, Defendants repeated the information about the JLL Reports that was contained in the October 2016 Solicitation.  [Doc. 60, p. 47].  Alar was responsible for the email's contents, and he had obtained copies of the JLL Reports approximately two months before sending the email.  Id.

### 5.   *Crowe Horwath Audit*

Defendants retained auditors Crowe Horwath to review the 2016 financial statements of WMP.[11]  Id. at 26.  Those financial statements reflected the direct investments in APT and SAC, with valuations that included the unrealized gains from the conversion transactions.  Id.  Defendants relied upon the JLL Reports in the financial statements, and Crowe Horwath asked Defendants for those reports. [Doc. 62, p. 26]; [Doc. 60, p. 38].  Defendants did not give the JLL Reports to Crowe Horwath, though, because Alar was not permitted to share them with third parties.  [Doc. 60, p. 38]; [Doc. 62, p. 31].

On July 28, 2017, Crowe Horwath issued an Independent Auditor's Report on WMP's 2016 financial statements.  [Doc. 65, p. 17]; see also [Doc. 61-10, p. 3].

---

[11] The record does not reflect whether an audit was conducted of WM Ltd.'s financial statements.

Among other things, the Independent Auditor's Report stated the following in its

Basis for Disclaimer of Opinion:

> [T]he financial statements include investments in [APT] and [SAC]
> whose fair values have been determined under procedures established
> by the General Partner.  We have evaluated the procedures established
> by the General Partner to estimate the fair values and have inspected
> the underlying documentation.  In our opinion, those procedures were
> not reasonable, and the documentation was not sufficient and
> appropriate to determine [APT]'s and [SAC]'s estimated fair values.
> The effect on the financial statements of not applying adequate
> valuation procedures related to [APT] and [SAC] are not readily
> determinable.

[Doc. 61-10, p. 4].  Crowe Horwath concluded the Independent Auditor's Report

with the Disclaimer of Opinion, stating:  "Because of the significance of the

matters described in the Basis for Disclaimer of Opinion paragraphs, we have not

been able to obtain sufficient appropriate audit evidence to provide a basis for an

audit opinion.  Accordingly, we do not express an opinion on these financial

statements."[12] Id. at 5; [Doc. 60, p. 28].  The Independent Auditor's Report also

provided that "[f]air value refers to the price that would be received to sell an asset

or paid to transfer a liability in an orderly transaction between market participants

---

[12] Crowe Horwath previously issued an unqualified audit opinion on SGS's June 30, 2014 financial statements.  [Doc. 62, p. 26].  That audit covered the period of June 19, 2014, to June 30, 2014, only.  [Doc. 53-3, p. 2].  Stevanovich testified that the JLL Reports were done specifically for SGS's audit.  [Doc. 62, p. 27].  Further, it was Alar's understanding that SGS provided Crowe Horwath with the JLL Reports for the June 2014 audit and that Crowe Horwath relied on those reports in issuing its unqualified opinion.  Id.

in the market in which the reporting entity transacts" and that "[t]he transaction price, excluding transaction costs, is typically the Partnership's best estimate of fair value at acquisition."  [Doc. 65, pp. 18, 19].  Additionally, in a July 28, 2017 letter ("July 2017 Audit Letter"), Crowe Horwath notified Defendants that West Mountain's approach to estimating the fair value of the APT and SAC investments was inconsistent with Generally Accepted Accounting Principles ("GAAP"). [Doc. 60, p. 28]; see [Doc. 51-4, p. 125].

### 6.    *APT's Discussions with Marathon Petroleum Company*

The following facts concern APT's interactions with Marathon Petroleum Company ("Marathon") in 2016 and 2017 and address (i) APT's pilot facility in Reno, Nevada; (ii) APT's plans to build a refinery in either Kentucky or West Virginia; and (iii) communications to West Mountain investors about these ventures.

At some point prior to February 2016, Argonne National Laboratory ("Argonne") used a sample of Marathon's high sulfur diesel feedstock to test APT's desulfurization technology.  [Doc. 62, p. 34].  Argonne produced a report about the test and concluded that APT's technology "performed well."  Id.  On February 19, 2016, Argonne introduced APT to Marathon.  Id.  That day, George Rudman, with APT, met with Steve McConnell, a technologist with Marathon, at

Marathon's Cattlesburg, Kentucky refinery and shared Argonne's report with him.
Id. at 34–35.

       i.       *APT's Reno, Nevada Pilot Facility*

On March 8, 2016, Rudman and APT's Vice President and Chief Engineer,
Jack Waldron, had a telephone call with McConnell and David Zalewski, a chemist
with Marathon, about APT's desulfurization process. Id. at 35. On that call, the
Marathon representatives stated that Marathon personnel would potentially visit
APT's pilot facility once it was functioning. Id. Marathon provided ten gallons of
middle distillate feedstock to APT after the call. Id. On July 1, 2016, Rudman
informed McConnell, Zalewski and Russell Lewis, another Marathon employee,
that APT's Reno, Nevada pilot facility was nearing completion and invited them
for a tour in August 2016. Id. at 36. On August 17, 2016, Lewis emailed Rudman
that he had contacted Marathon's technology group to see if they wanted to tour
the facility. Id. On August 18, 2016, APT sent Marathon, again, the Argonne
report on APT's desulfurization technology. Id. at 35.

On May 6, 2017, Stevanovich emailed Lewis to inform him that APT
completed a mini-plant in Reno and that the plant was operational; Stevanovich
requested a meeting with Marathon later that week. Id. at 40. Lewis responded

that "[p]erhaps with more notice the next time you are in the area we could arrange a meeting." Id.

### ii.    APT's Plans for a Plant in Kentucky or West Virginia

On June 1, 2016, APT entered into a consulting agreement with Omar Sheikh, an individual with experience in the energy industry, for the purpose of identifying certain target parties, including "prospective investors, customers and/or Joint Venture partners . . . for a transaction . . . involving [APT's] oxidative desulfurization technology." Id. at 37 (alterations in original).  One of the specified target parties was Marathon.  Id.  Sheikh presented APT with a plan to build a desulfurization plant in West Virginia or Kentucky that would be close to large gas refineries, including a Marathon refinery, located in those states.  Id. Once the plant was built, APT's plan was to contract with Marathon to obtain some of Marathon's high sulfur diesel feedstock, desulfurize it and sell it back to Marathon.  Id. at 38.

Stevanovich, Sheikh and Jack Carter, an APT board member, met with state and local government officials in Kentucky and West Virginia to present APT's proposal for building a facility.  Id.  Sheikh also approached contacts at Marathon's Cattlesburg refinery about the opportunity with APT.  Id. at 39.  Sheikh participated in at least five meetings with West Virginia and Kentucky officials

and, in 2017, at least six phone calls or meetings with Marathon employees.  Id.

On May 9, 2017, Stevanovich, Sheikh and Waldron conducted a site visit at

Riverway, Kentucky, to assess a potential location for an APT plant near

Marathon's Cattlesburg refinery.  Id. at 40.  Sheikh testified that to his knowledge,

discussions with Marathon were still ongoing when his consulting contract ended

in October 2017.  [Doc. 52-31, p. 13]; [Doc. 62, p. 37].  Stevanovich testified,

though, that the plans for a plant in Kentucky never materialized.  [Doc. 66-3, p.

27].

### iii.    Communications about Marathon with Investors

Meanwhile, Stevanovich kept Alar informed of APT's interactions with

Marathon.  [Doc. 62, p. 41].  For example, Stevanovich informed Alar that APT

"worked with Argonne and is now working with [Kentucky/West Virginia] local

governments and Marathon Oil"; that Argonne tested APT's technology using

Marathon's sample distillate; and that APT was scheduling a meeting with various

Marathon employees in Kentucky.  Id. at 41–42.

On July 12, 2017, Stevanovich participated in a call with Alar and Michael

Pruner, West Mountain's Chief Compliance Officer, who took notes during the

call.[13]  Id. at 43.  During the call, Stevanovich provided an update on APT's

attempts to work with Marathon, including APT's plans to obtain diesel from

Marathon to desulfurize, the possible location of and financing for an APT plant

near Marathon's Cattlesburg refinery and Stevanovich's expectations that an

engineering firm would sign off on plans for the plant in a few weeks.  Id.

Stevanovich informed Alar and Pruner that Marathon's Cattlesburg refinery was at

capacity for desulfurized fuel and that a meeting was scheduled for July 25, 2017,

to discuss next steps, including signing an agreement in August.  Id. at 43–44.

Stevanovich described that potential August agreement as a "valuation trigger."

Id. at 44.

---

[13] The SEC objected to these facts on the grounds that Pruner's notes are inadmissible
hearsay.  "The general rule is that inadmissible hearsay 'cannot be considered on a
motion for summary judgment.'"  Macuba v. Deboer, 193 F.3d 1316, 1322 (11th Cir.
1999) (footnote omitted) (quoting Garside v. Osco Drug, Inc., 895 F.2d 46, 50 (1st Cir.
1990)).  However, "a district court may consider a hearsay statement in passing on a
motion for summary judgment if the statement could be 'reduced to admissible evidence
at trial' or 'reduced to admissible form.'"  Id. at 1323.  The notes could be admissible at
trial under the hearsay exception for present sense impressions.  See Fed. R. Evid. 803(1);
see also United States v. Perl, 492 F. App'x 37, 40–41 (11th Cir. 2012).  Alternatively,
the notes could be admissible under the hearsay exception for records of a regularly
conducted activity.  See Fed. R. Evid. 803(6); Braggs v. Dunn, No. 2:14-CV-601, 2017
WL 426875, at *1 (M.D. Ala. Jan. 31, 2017) (finding that meeting minutes were
admissible under the business records exception to the hearsay rule); Sheppard v. Peters,
No. 1:07-CV-3217, 2009 WL 10702049, at *11 (N.D. Ga. May 13, 2009) (concluding
that meeting minutes "likely fall[] within the business records exception to the hearsay
rule" and "would thus be admissible at trial if accompanied by the proper testimony"), R.
& R. adopted in relevant part, 2009 WL 10702065 (N.D. Ga. May 26, 2009).

Alar then repeated what Stevanovich told him on the call in a newsletter to investors that Defendants issued on July 13, 2017 (the "July 2017 Newsletter").

Id.  The July 2017 Newsletter stated the following:

> Negotiations with Marathon Oil are in full swing.  As mentioned previously, APT expects to position its diesel desulfurization plant in close proximity to a Marathon refinery located in Appalachia.  The refinery's current fuel desulfurization process . . . is at full capacity and the company is looking to APT to add more.  As it stands right now, if Marathon is satisfied that the technology works, a tacit plan has been arrived at where APT would receive diesel at no cost from Marathon.  APT would then desulfurize and sell the diesel back to Marathon.  The benefit to APT is obvious, but the arrangement also works for Marathon because it will still be cheaper than using its own [desulfurization] process.  Discussions/testing is ongoing, but an agreement is expected to be reached in August or September.  Importantly, [SGS] has indicated the signing of a contract with Marathon would trigger a revaluation of APT.

Id. at 44–45; see also [Doc. 52-51, pp. 2–3].

On September 25, 2017, Stevanovich and Waldron gave a tour of APT's Reno pilot plant to Greg Silberman, a West Mountain investor.  [Doc. 62, p. 46]. Stevanovich told Silberman during the tour that APT was in ongoing negotiations with Marathon.  Id.  Stevanovich also told Silberman that Marathon was the likely candidate to supply the feedstock that APT would desulfurize.  Id. at 46–47.  The information about APT's negotiations with Marathon in the July 2017 Newsletter was consistent with what Stevanovich later told Silberman during the Reno visit. Id. at 47.

In September 2017, Alar participated in a call (the "September 2017 Investor Call") with West Mountain investors Frank Hill and John Schaefer.  Id. During the call, Hill asked Alar, "what contracts have in fact been signed and what are anticipated to be signed this year?"  Id.  Alar replied that "the closest one" was Marathon and explained that he "suspect[ed that] Marathon will probably be the first contract signed with APT."  Id.  Alar further stated that it would be a "bankable event" when APT obtained a contract with Marathon.  Id. at 48.

## ANALYSIS

### A.    Legal Standards

Under Federal Rule of Civil Procedure 56(a), a "court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  A material fact is any fact that "is a legal element of the claim under the applicable substantive law which might affect the outcome of the case."  Allen v. Tyson Foods, Inc., 121 F.3d 642, 646 (11th Cir. 1997).  A genuine dispute exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  Ultimately, "[t]he basic issue before the court on a motion for summary judgment is 'whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is

so one-sided that one party must prevail as a matter of law.'" <u>Allen</u>, 121 F.3d at

646 (quoting <u>Anderson</u>, 477 U.S. at 251).

     The party moving for summary judgment bears the initial burden of showing

that no genuine issue exists as to any material fact, "and in deciding whether the

movant has met this burden the court must view the movant's evidence and all

factual inferences arising from it in the light most favorable to the nonmoving

party." <u>Id.</u>  After the movant satisfies this initial burden, the nonmovant bears the

burden of showing specific facts indicating that summary judgment is improper

because a material issue of fact does exist. <u>Id.</u>  However, "[a] mere 'scintilla' of

evidence supporting the opposing party's position will not suffice; there must be

enough of a showing that the jury could reasonably find for that party." <u>Walker v.</u>

<u>Darby</u>, 911 F.2d 1573, 1577 (11th Cir. 1990) (quoting <u>Anderson</u>, 477 U.S. at 251).

If the record taken as a whole cannot lead "a rational trier of fact to find for the

non-moving party, there is 'no genuine issue for trial.'" <u>Matsushita Elec. Indus.</u>

<u>Co. v. Zenith Radio Corp.</u>, 475 U.S. 574, 587 (1986) (quoting <u>First Nat'l Bank of</u>

<u>Ariz. v. Cities Serv. Co.</u>, 391 U.S. 253, 288 (1968)).

     "The Advisers Act sets 'federal fiduciary standards for investment

advisers.'" <u>ZPR Inv. Mgmt. Inc. v. SEC</u>, 861 F.3d 1239, 1247 (11th Cir. 2017)

(quoting <u>Santa Fe Indus., Inc. v. Green</u>, 430 U.S. 462, 471 n.11 (1977)).  Section

206(1) of the Act prohibits investment advisers[14] from "employ[ing] any device, scheme, or artifice to defraud any client or prospective client."  15 U.S.C. § 80b-6(1).  Under Section 206(2), it is unlawful for an investment adviser "to engage in any transaction, practice, or course of business which operates as a fraud or deceit upon any client or prospective client."  Id. § 80b-6(2).  Finally, an investment adviser violates Section 206(4) by "engag[ing] in any act, practice, or course of business which is fraudulent, deceptive, or manipulative."[15]  Id. § 80b-6(4).

To establish a violation of Sections 206(1), 206(2) or 206(4), the SEC must "show [that] the investment adviser made a material misrepresentation with a culpable mental state."  ZPR Inv. Mgmt., 861 F.3d at 1247.  The materiality requirement is the same across these provisions:  an omitted fact or misleading statement "'is material if there is a substantial likelihood that a reasonable [investor] would consider it important.'"  Id. at 1248–49 (alteration in original)

---

[14] Defendants do not challenge their status as "investment advisers," which is defined under 15 U.S.C. § 80b-2(a)(11).

[15] Under Rule 206(4)-8, an investment adviser to "a pooled investment vehicle" commits "a fraudulent, deceptive, or manipulative act" within the meaning of Section 206(4) if he "[m]ake[s] any untrue statement of a material fact or . . . omit[s] to state a material fact necessary to make the statements made, in the light of the circumstances under which they were made, not misleading, to any investor or prospective investor in the pooled investment vehicle" or if he "[o]therwise engage[s] in any act, practice, or course of business that is fraudulent, deceptive, or manipulative with respect to any investor or prospective investor in the pooled investment vehicle."  17 C.F.R. § 275.206(4)-8.

(quoting Basic Inc. v. Levinson, 485 U.S. 224, 231 (1988)).  However, the requisite mental state for Section 206(1) differs from that for Sections 206(2) and 206(4).  Section 206(1) requires a showing of scienter, which may be established through proof of knowing misconduct or severe recklessness.  Id. at 1247; SEC v. Carriba Air, Inc., 681 F.2d 1318, 1324 (11th Cir. 1982).  In contrast, Sections 206(2) and 206(4) do not require scienter; "a showing of negligence is sufficient." ZPR Inv. Mgmt., 861 F.3d at 1247.

## B.    Overvaluation Claim

The SEC argues that Defendants violated Sections 206(1), 206(2) and 206(4), as well as Rule 206(4)-8, by fraudulently overvaluing the APT and SAC investments.  Defendants argue that they had a reasonable basis for their valuations and therefore that the SEC cannot prove the requisite state of mind.

Scienter is usually a question for the factfinder, but "summary judgment is appropriate if no reasonable jury could find that a defendant acted without scienter."  SEC v. Watkins Pencor, LLC, 810 F. App'x 823, 830 (11th Cir. 2020). "Scienter is 'a mental state embracing intent to deceive, manipulate, or defraud.'" ZPR Inv. Mgmt., 861 F.3d at 1252 (quoting Matrixx Initiatives, Inc. v. Siracusano, 563 U.S. 27, 48 (2011)).  Extreme recklessness is sufficient to show scienter for a Section 206(1) violation.  Id.  Proof of extreme recklessness entails showing

> a highly unreasonable omission, involving not merely simple, or even [in]excusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

SEC v. Sw. Coal & Energy Co., 624 F.2d 1312, 1321 n.17 (5th Cir. 1980) (internal punctuation and citation omitted).[16]  For claims under Sections 206(2) and 206(4), "[n]egligence requires a showing that the investment adviser failed to exercise 'reasonable care.'" ZPR Inv. Mgmt., 861 F.3d at 1254 (quoting SEC v. Cap. Gains Rsch. Bureau, Inc., 375 U.S. 180, 194 (1963)).

The SEC argues that Defendants acted recklessly[17] by (1) improperly relying on the JLL Reports for the valuation of the APT and SAC investments; (2) not determining the investments' value according to the fair value standard; and (3) continuing to use the same valuation figures even after the July 2017 Audit Letter,

---

[16] "[D]ecisions of the United States Court of Appeals for the Fifth Circuit . . . handed down by that court prior to the close of business on [September 30, 1981], shall be binding as precedent in the Eleventh Circuit." Bonner v. City of Prichard, 661 F.2d 1206, 1207 (11th Cir. 1981) (en banc).

[17] In its Motion for Summary Judgment, the SEC does not specifically argue that Defendants acted negligently, instead arguing that all of Defendants' actions meet the "extreme recklessness" standard for scienter under Section 206(1) and, presumably, that their actions necessarily meet the lower state of mind, negligence, required for Sections 206(2) and 206(4). Further, both parties direct their arguments to the relevant state-of-mind requirements for the alleged violations, rather than the materiality component; the Court's analysis reflects this focus.

which informed Defendants that their valuation methodology was unreasonable and inconsistent with GAAP.[18]

### 1.    Reliance on JLL Reports[19]

It is uncontested that Defendants did not see the JLL Reports until January 2017—*after* the valuation of the APT and SAC assets.  Alar claims that he knew of the Reports' existence and had knowledge of their contents as early as 2014.  The record is unclear as to the extent of Alar's familiarity with the JLL Reports prior to the valuation.  Without such evidence, the Court is not prepared to hold that, as a matter of law, an investment adviser acts recklessly within the meaning of Section

---

[18] Additionally, Defendants argue that they are entitled to summary judgment on the overvaluation claim because the SEC did not present evidence of APT and SAC's correct values, therefore defeating any claim that Defendants *over*valued those investments. Defendants did not cite any legal authority for the proposition that the SEC is obliged to present this evidence, and courts in this district have rejected this argument.  See SEC v. Mannion, No. 1:10-cv-3374, 2013 WL 1291621, at *10 (N.D. Ga. Mar. 25, 2013) ("Defendants do not cite, and the Court is not aware of, any authority holding that the [SEC] is required to prove the correct value of [the investment] in order to demonstrate, as a threshold matter, that Defendants' ascribed value was inflated.").

[19] Defendants contend that the JLL Reports were not their sole source for valuing the APT and SAC investments; the SEC does not address this argument.  As previously noted, the West Mountain Funds held investments in the Westford Funds, which itself invested in APT and SAC.  Defendants thus held indirect investments in APT and SAC (through their investments in the Westford Funds) and direct investments in APT and SAC (i.e., the assets held by the West Mountain Funds).  The Westford Funds provided the West Mountain Funds with regular net-asset-value ("NAV") calculations. Defendants relied on these NAV calculations to calculate the NAV for the Funds' investors, and Defendants calculated both their direct and indirect investments in APT and SAC at the same value.  See [Doc. 59, p. 19].

206(1) by valuing investments based on reports that he has not seen but of which he has some degree of knowledge.  Further, a reasonable jury could find that Defendants were at least negligent by valuing the APT and SAC assets without personally reviewing the documentation on which the new values were based, such that Defendants violated Sections 206(2) or 206(4).

The SEC contends that in any case, the JLL Reports were an improper source for the valuation because they contained an express disclaimer that their findings "cannot and should not be regarded as an independent valuation" and "[do] not constitute a formal opinion of value."  [Doc. 52-10, p. 34]; [Doc. 52-11, p. 31].  According to the SEC, then, Defendants were reckless by "rely[ing] on reports issued more than seven years ago which, by their terms, were not intended to constitute formal opinions of value."  [Doc. 51-1, p. 25].

However, Defendants argue extensively—pointing to facts in support—that they believed the JLL Reports to constitute independent valuations.  The JLL Reports contained language about "estimating the fair value" of APT and SAC, and Stevanovich, who commissioned the reports, believed them to constitute independent valuations.  Defendants' valuation expert provided an expert report in which he concluded that the JLL Reports "proclaimed to be independent valuations by a third party."  [Doc. 52-28, p. 9].  The expert report further explained that the

JLL Reports contained "contradictory information in the limiting conditions" and "did not make it abundantly clear to a reader, especially a reader who is not a member of the valuation industry, that JLL was not providing an independent valuation." Id. Therefore, while the JLL Reports included explicit language limiting their use as formal valuations, Defendants have put forth expert testimony that a reader might reasonably construe the Reports to constitute third-party, independent valuations. If Defendants fairly viewed the JLL Reports as independent valuations, a reasonable jury could find that Defendants were not reckless and exercised at least ordinary care in relying on those reports to inform the valuation of the APT and SAC investments. Because the "evidence is such that a reasonable jury could return a verdict for the nonmoving party," summary judgment is not appropriate. Anderson, 477 U.S. at 248.

Accordingly, the Court declines to grant summary judgment on this ground because genuine disputes of fact exist as to whether Defendants acted recklessly by valuing the investments without having seen the JLL Reports but with some knowledge of their contents and whether those Reports could reasonably be viewed as formal valuations in the first instance.

### 2.     *Use of Fair Value Standard*

The parties agree about the following facts:  ascertaining the fair value of an investment requires a determination of the amount that an arm's-length buyer, under the circumstances, would currently pay for the security; this is the "fair value standard."  For private operating companies, the transaction price, excluding transaction costs, is typically the best estimate of fair value at acquisition.  And at each subsequent measurement date after acquisition, the best estimate of fair value is the expected exit value of the investment under current market conditions.  See [Doc. 60, p. 20].

The SEC contends that Defendants acted recklessly by failing to value the APT and SAC investments according to the fair value standard.  The SEC claims that Alar has never tried to determine the fair value of the investments, which provides "conclusive proof of his recklessness."  [Doc. 51, p. 24].  More precisely, though, Alar testified that he has never attempted to *sell* his APT or SAC shares and has "no desire" to find out the price at which he could sell them.  [Doc. 66-4, p. 45].  Alar did not testify explicitly that he had no desire to determine the fair value of the shares, and the Court is unwilling to impute this interpretation to his testimony absent further evidence.  Assessing testimony in this regard is instead the role of the factfinder.  See SEC v. Adler, 137 F.3d 1325, 1342 (11th Cir. 1998)

("We conclude that these fact-intensive issues should be decided by a jury, which is in the position to observe the demeanor of witnesses and make appropriate credibility determinations.").

In response to the SEC's argument about the fair value standard, Defendants explain that the APT and SAC investments are Level 3 Assets, which are difficult to value. Level 3 Assets, according to Defendants, are illiquid and usually "valued by using estimates, subjective assumptions, and models." [Doc. 64, p. 6]. The SEC did not address whether the nature of the APT and SAC investments affected the proper method of their valuation. Without any argument to the contrary, it appears that a reasonable jury could conclude that the type of assets at issue impacted the method of their valuation such that Defendants were neither reckless nor negligent in their approach.

Additionally, Defendants note that the JLL Reports defined "fair value" according to the parties' agreed-upon definition of the fair value standard: as "the price that would be received to sell an asset, or paid to transfer a liability, in an orderly transaction between market participants at the measurement date." [Doc. 52-10, p. 9]; [Doc. 52-11, p. 9]. To value the investments, Defendants relied on the JLL Reports, which in turn used the fair value standard. As noted above, the question of whether Defendants acted recklessly or negligently by relying on these

reports in the first instance is one this Court reserves for the jury.  But because the JLL Reports included the same fair value standard upon which the SEC insists, a question of fact remains as to whether using the Reports for the valuation constituted sufficient reliance on the fair value standard.

The arguments presented and cases cited by the SEC on the valuation issue do not militate a different conclusion.  As an initial matter, the SEC has not pointed to any case law holding that an investment adviser acts recklessly or negligently unless he uses a certain methodology to value assets.  The SEC claims, however, that "the law is clear" that "if someone makes a baseless statement about a purported increase in the value of a security, he or she commits fraud as a matter of law."  [Doc. 51-1, p. 22].  The SEC cites to SEC v. Ali, 454 F. Supp. 3d 1281 (N.D. Ga. 2020), to support this assertion.  In Ali, the court determined that "no reasonable jury could conclude" that the defendant's representations about the value of an acquisition were true.  Id. at 1293.  The facts in that case do not guide this matter to a like conclusion, though.  The Ali defendant stated in press releases that a planned acquisition could be valued at over $15 million.  Id. at 1288. However, there was "no documentary evidence of any . . . $15 million valuation performed by [the defendant]," supporting the SEC's contention that the defendant's representation that his company "could potentially earn millions from

the deal[] was baseless."  Id. at 1293, 1284–85.  Here, Defendants knew of the

existence and, to some degree, the contents of documentary evidence of a valuation

performed on the assets at issue—the JLL Reports.  A reasonable jury could

conclude, then, that Defendants' statements about the APT and SAC investments

were not "baseless" in the manner described in Ali.

Given the fact-specific inquiry associated with asset valuation, particularly

the supposed Level 3 Assets here, whether Defendants acted recklessly or

negligently in their approach to valuing the investments is a matter that cannot be

resolved on summary judgment.

### 3.    *Effect of July 2017 Audit Letter*

Finally, the SEC contends that Defendants acted recklessly by failing to

adjust their valuation approach after receiving the July 2017 Audit Letter

informing them that the valuation methodology for WMP's assets was neither

reasonable nor consistent with GAAP.[20]  Defendants claim that the SEC's

argument overlooks two relevant facts:  Crowe Horwath did not have the JLL

---

[20] Defendants point out that the JLL Reports' definition of "fair value" is identical to the GAAP valuation standard.  [Doc. 59, p. 18 n.8].  If Defendants justifiably relied on the JLL Reports to value the APT and SAC assets (which, as noted earlier, is a question for the factfinder), a reasonable jury could find that Defendants' valuation method comported in some manner with GAAP.

Reports when it conducted the audit of WMP, and Crowe Horwath had separately issued an unqualified audit opinion in which it *did* have the reports.

It is undisputed that Crowe Horwath did not have copies of the JLL Reports when it audited WMP.  Defendants contend that they were aware of Crowe Horwath's *unqualified* audit opinion on SGS's June 30, 2014 financial statements (the "SGS Audit Opinion").  They argue that the SGS Audit Opinion—which allegedly relied on the JLL Reports, unlike the audit of WMP—represented Crowe Horwath's conclusion "that JLL's valuations of APT/[SAC] were reasonable and sufficiently documented" and therefore offered Defendants "additional support" for the valuation of the APT and SAC investments.  [Doc. 59, p. 21].

The SEC argues that the SGS Audit Opinion has limited value because it was a "beginning balance" audit, covering a period of eleven days, and because it was not an audit of APT or SAC but rather of a third company (i.e., SGS) that held shares in APT and SAC.  [Doc. 63, p. 8].  Alar himself testified that he considers a beginning balance audit to be less "thorough" than an annual financial audit, but he also explained that he would tell investors that a beginning balance audit was "a snapshot of the values or the company at a certain start date."  [Doc. 66-2, p. 22].

The parties agree that as of the day Alar read the Independent Auditor's Report and the July 2017 Letter, he knew that Crowe Horwath considered

Defendants' procedures for valuing the APT and SAC investments to be "not reasonable." [Doc. 60, p. 29]. However, the parties disagree about the implication of this fact. The SEC argues that it shows Defendants' scienter, since Defendants did not subsequently change how they valued the investments. Defendants contend that the SGS Audit Opinion supported their valuation (especially because that opinion relied on the actual JLL Reports), and consequently, that they did not act recklessly or without reasonable care in continuing to use those values. "Summary judgment may be inappropriate even where the parties agree on the basic facts, but disagree about the inferences that should be drawn from these facts. If reasonable minds might differ on the inferences arising from undisputed facts, then the court should deny summary judgment." Clemons v. Dougherty Cnty., 684 F.2d 1365, 1369 (11th Cir. 1982) (citation omitted). Reasonable minds might differ about whether Defendants acted with extreme recklessness or negligence following the July 2017 Audit Letter and about the effect of the SGS Audit Opinion on Defendants' conduct and decision-making.

To prevail on summary judgment, the SEC must show by a preponderance of the evidence that Defendants were reckless, for Section 206(1) liability, or negligent, for Sections 206(2) or 206(4) liability, when valuing the APT and SAC assets. For Defendants to succeed, they must show by that same standard that their

conduct comported with, or was not an extreme departure from, the exercise of ordinary care.  Neither party made the applicable showing.  Because genuine issues of fact remain as to whether Defendants acted with the requisite state of mind under Sections 206(1), 206(2) and 206(4) when valuing the APT and SAC investments, the SEC's Motion for Summary Judgment and Defendants' Motion for Summary Judgment are **DENIED** as to the overvaluation claim.

## C.    Misrepresentation Claim

The SEC claims that Defendants violated Section 206(4) and Rule 206(4)-8 by misrepresenting to investors the existence of negotiations with Marathon and argues that an issue of triable fact remains that is sufficient to preclude summary judgment.  Defendants contend that they are entitled to summary judgment on the misrepresentation claim because no genuine disputes of fact remain.

In the Complaint, the SEC charges that Defendants had "no basis" for the statements in the July 2017 Newsletter and the September 2017 Investor Call about APT's alleged negotiations with Marathon and that none of those statements were true.  See [Doc. 1, p. 14].  This assertion is unsupported by the facts, which show that Alar had *some basis* for his statements.  The July 12, 2017 call with Stevanovich and Pruner provided Alar with information about APT's plans to obtain diesel from Marathon for desulfurization and about financing for and the

location of an APT plant near Marathon's Kentucky or West Virginia refineries. Stevanovich also informed Alar that a meeting was scheduled for July 25, 2017, to discuss next steps, including the signature of an agreement at some point in August.  Further, it is uncontested that APT representatives participated in multiple meetings and phone calls in 2016 and 2017 with government officials and Marathon employees about the proposed project between APT and Marathon.

The SEC points to Stevanovich's deposition testimony as raising a genuine dispute of fact, namely because Stevanovich "does not remember things the way Alar does."  [Doc. 61, p. 24].  Several portions of Stevanovich's testimony are relevant here.  Stevanovich responded "yes" when asked if he was "familiar with proposed negotiations or a deal between [APT] and Marathon Oil."  [Doc. 66-3, p. 26].  He described "two separate sort of timeframes when we had touched base with Marathon," the first concerning the Reno pilot plant and the second addressing the prospective plant in Kentucky or West Virginia.  Id.  As to this second phase, Stevanovich explained that Marathon ultimately did not need APT's services "[a]nd so there was nothing to do with Marathon in Kentucky."  Id. at 27. Yet Stevanovich went on to testify that he did not "remember any specific discussion about Marathon" with Alar or any discussion at all with Pruner.  Id. at 27–28.

In ruling on a motion for summary judgment, "the court must avoid weighing conflicting evidence or making credibility determinations." Stewart v. Booker T. Washington Ins., 232 F.3d 844, 850 (11th Cir. 2000).  Additionally, the party seeking summary judgment—here, Defendants—must "identify those portions of the pleadings, depositions, answers to interrogatories, and admissions which it believes show an absence of any genuine issue of material fact." Hairston v. Gainesville Sun Publ'g Co., 9 F.3d 913, 918 (11th Cir. 1993).

Stevanovich testified that he did not recall discussing Marathon negotiations with Alar and that those negotiations never came to fruition; Defendants put forth evidence that Stevanovich informed Alar about ongoing negotiations.  The record thus contains conflicting evidence as to the existence of negotiations between Marathon and APT and, relatedly, whether Defendants had knowledge of those alleged negotiations such that their representations to investors were made negligently.  Defendants argue only that Stevanovich's testimony is insufficient to create a genuine issue of material fact.  However, Alar appears to have relied entirely on his communications with Stevanovich to support his subsequent representations to investors.  The Court thus does not agree that Stevanovich's testimony is only speculative or "merely colorable." Morales v. Ga. Dep't of Hum. Res., 446 F. App'x 179, 181 (11th Cir. 2011) (quoting Anderson, 477 U.S. at 249–

50).  Because a genuine dispute of fact remains with respect to the

misrepresentation claim, Defendants' Motion for Summary Judgment on this claim

is **DENIED**.

**CONCLUSION**

Based on the foregoing, the SEC's Motion for Summary Judgment [Doc. 51]

and Defendants' Motion for Summary Judgment [Doc. 52] are **DENIED**.  The

parties are **HEREBY ORDERED** to file the consolidated pretrial order required

by Local Rule 16.4 no later than twenty-one days from the entry of this Order.  The

parties are notified that a failure to comply with this Order may result in sanctions,

including dismissal of the case or entry of default judgment.  In the event a

consolidated pretrial order is not filed, the Clerk is **DIRECTED** to submit the case

at the expiration of the applicable time period.

**SO ORDERED** this 29th day of March, 2022.

**J. P. BOULEE**
United States District Judge